IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JAMES LEE HENDERSON, #999105, | § | |
| | § | |
| *Petitioner,* | § | |
| | § | Civil Action No. 1:06-CV-507 |
| v. | § | |
| | § | JUDGE RON CLARK |
| DIRECTOR, TDCJ-CID, | § | |
| | § | |
| *Respondent.* | § | |

**MEMORANDUM OPINION AND
ORDER OF DISMISSAL**

Petitioner James Lee Henderson ("Henderson"), a death row inmate confined in the Texas

prison system, was convicted of capital murder and sentenced to death in the 102nd Judicial

District Court of Red River County, Texas, in Cause Number 181-CR-1293, *The State of Texas vs.*

*James Lee Henderson.* After his conviction was affirmed, and after his first habeas petition was

rejected, Henderson claimed he was mentally retarded and challenged his death sentence pursuant

to *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002). He has been authorized by the United

States Court of Appeals for the Fifth Circuit to file a successive petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 .

In giving Henderson permission to file a successive petition, the Fifth Circuit found that he

had made a *prima facie* showing of mental retardation. The Court added, however, that unless the

doctrine of equitable tolling applied, the successive petition is time-barred. *In re Henderson*, 462

F.3d 413, 417 (5th Cir. 2006); *see* 28 U.S.C. § 2244(d)(1).

On March 31, 2008 this court found that Henderson was not entitled to equitable tolling,

and the petition was denied ("*Henderson I*"). However, the case was remanded with instructions to

this court to consider the doctrine of equitable tolling in light of the Supreme Court's then-recent decision in *Holland v. Florida*, 560 U.S.—, 130 S. Ct. 2549 (2010). *Henderson v. Thaler*, 626 F.3d 773 (5th Cir. 2010).

Whether or not Henderson's time limits should be equitably tolled is a close question. However, assuming *arguendo* that equitable tolling applies, the State trial court held a full hearing on the issue of mental retardation and set out findings and conclusions supporting its judgement that Mr. Henderson is not mentally retarded. The State appellate court reviewed the question carefully and affirmed. The issue has been fully briefed in this court and the court has carefully reviewed the record developed in the State court. This court does not find that the State court adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. The petition is denied.

## I.  PROCEDURAL HISTORY OF THE CASE

Henderson was convicted and sentenced to death in June 1994 for the murder of an elderly woman in her home. The judgment and sentence were affirmed on direct appeal to the Texas Court of Criminal Appeals in 1996. *Henderson v. Texas*, No. 71,928 (Tex. Crim. App. Dec. 18, 1996). Henderson then filed an application for a writ of habeas corpus in state court. The Texas Court of Criminal Appeals, adopting the recommendation of the trial court, denied relief in July 1998. *Ex parte Henderson*, No. 37,658-01 (Tex. Crim. App. July 8, 1998). Henderson's petition for a writ of certiorari was denied by the United States Supreme Court in November 1998. *Henderson v. Texas*, 525 U.S. 1004, 119 S. Ct. 516 (1998) (mem.). He then filed his first subsequent state writ application raising claims unrelated to the issue here, which was denied as an

abuse of the writ in October 1999. *Ex parte Henderson*, No. 37,658-02 (Tex. Crim. App. Oct. 27, 1999).

In January 1999, while Henderson's second state application was pending, he filed his initial federal petition for a writ of habeas corpus. The petition was denied in September 2001, and the Fifth Circuit affirmed the denial of habeas relief. *Henderson v. Cockrell*, 333 F.3d 592 (5th Cir. 2003). The Supreme Court denied certiorari on January 26, 2004. *Henderson v. Dretke*, 540 U.S. 1163, 124 S. Ct. 1170 (2004)(mem.).

On March 24, 2004, Henderson filed a second subsequent state application for a writ of habeas corpus claiming, for the first time, that he is mentally retarded and therefore ineligible for the death penalty under *Atkins*. The case was remanded to the Texas trial court for an evidentiary hearing. On remand, the trial court conducted an evidentiary hearing and issued findings of fact and conclusions of law. The Texas Court of Criminal Appeals subsequently agreed with the trial court's determination that Henderson failed to show, by a preponderance of the evidence, that he is mentally retarded, and relief was denied. *Ex parte Henderson*, No. WR-37,658-03, 2006 WL 167836 (Tex. Crim. App. Jan. 25, 2006)

On March 6, 2006, Henderson filed a motion seeking authorization to file a successive petition for a writ of habeas corpus with the Fifth Circuit. The Fifth Circuit granted the motion. *In re Henderson*, 462 F.3d 413 (5th Cir. 2006). The Court of Appeals stated that "unless the doctrine of equitable tolling applies, Henderson's successive petition is time-barred," citing 28 U.S.C. § 2244(d)(1), and left it to this court to decide whether Henderson's case presents the "rare and exceptional circumstances" that would entitle him to equitable tolling. *Id.* at 417.

This court received the order from the Fifth Circuit granting Henderson permission to file a successive petition on September 1, 2006. On March 31, 2008, this court found that Henderson

3

was not entitled to equitable tolling; thus, the petition was denied.  On November 16, 2010, the

Fifth Circuit remanded the case for further consideration in light of the Supreme Court's then-

recent decision in *Holland*.

## II.  STATUTE OF LIMITATIONS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") made several

changes to the federal habeas corpus statutes, including the addition of a statute of limitations.  28

U.S.C. § 2244(d)(1).  In the present case, Henderson had one year to file a petition for a writ of

habeas corpus, with the one year period of time commencing to run from "the date on which the

constitutional right asserted was initially recognized by the Supreme Court . . . and made

retroactively applicable to cases on collateral review."  28 U.S.C. § 2244(d)(1)(C).  The Supreme

Court issued *Atkins* on June 20, 2002, so the one year limitations period for filing a habeas

application based on *Atkins* expired on June 20, 2003.  AEDPA also provides that the "time during

which a properly filed application for State post-conviction or other collateral review with respect

to the pertinent judgment or claim is pending shall not be counted toward any period of limitation."

28 U.S.C. § 2244(d)(2).

Henderson did not have a post-conviction application for relief pending in state court

during the one year period of time that would allow for the tolling of the limitations period.

Henderson concedes that his federal petition for a writ of habeas corpus was not filed within the

one year limitations period contained within the statute.  In remanding the case, the Fifth Circuit

held that "Henderson did not file his *Atkins* petition until August 24, 2006.  Accordingly, unless

equitable tolling applies, it plainly is time-barred."  *Henderson v. Thaler*, 626 F.3d at 777.

The issue before this court is whether equitable tolling should apply in this case.  The

chronology of important dates and events regarding this issue are as follows:

4

### Chronology

| | |
|---|---|
| June 20, 2002 | United States Supreme Court issues the opinion in *Atkins v. Virginia, supra*. |
| June 9, 2003 | The Fifth Circuit affirms the denial of Henderson's initial federal petition. |
| June 20, 2003 | The one year statute of limitations expires for filing a petition for a writ of habeas corpus under § 2244(d)(1) raising an *Atkins* claim. |
| January 16, 2004 | Dr. Susana Rosin, a psychologist, evaluates Henderson. |
| January 26, 2004 | The United States Supreme Court denies certiorari on Henderson's initial federal petition for a writ of habeas corpus. |
| February 11, 2004 | The Texas Court of Criminal Appeals abandons the two-forum rule in *Ex parte Soffar*, 143 S.W.3d 804, 806 (Tex. Crim. App. 2004). |
| March 19, 2004 | Dr. Rosin completes her report evaluating Henderson. |
| March 24, 2004 | Henderson files a successive state application for a writ of habeas corpus raising the *Atkins* claim. |
| April 21, 2004 | The Texas Court of Criminal Appeals remands Henderson's case to the trial court for a hearing on *Atkins*. |
| January 25, 2006 | The Texas Court of Criminal Appeals adopts the trial court's findings and conclusions and denies relief. |
| March 6, 2006 | Henderson files a motion to file a successive petition for a writ of habeas corpus with the Fifth Circuit Court of Appeals raising an *Atkins* claim. |
| August 23, 2006 | The Fifth Circuit Court of Appeals grants Henderson's motion for permission to file a successive petition for a writ of habeas corpus. |
| August 24, 2006 | Henderson files the present petition in this court. |

AEDPA's statute of limitations may be tolled for equitable reasons. *Holland v. Florida*, 560 U.S. at —, 130 S. Ct. at 2560. To establish his entitlement to equitable tolling, a petitioner must show (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way and prevented timely filing. *Id.* at 2562. The diligence required is "reasonable diligence," not "maximum feasible diligence." *Id.* at 2565. The extraordinary

circumstances prong is not satisfied by a showing that petitioner's attorney engaged in excusable neglect or a simple miscalculation of a filing deadline.  *Id.* at 2564.  On the other hand, the Court rejected as "too rigid" the standard applied by the Eleventh Circuit, which had held that "even attorney conduct that is 'grossly negligent' can never warrant tolling absent 'bad faith, dishonesty, divided loyalty, mental impairment or so forth on the lawyer's part.'" *Id.* at 2562-63.

While the Supreme Court stated that the question of what is an "extraordinary circumstance" necessarily involves a "fact-intensive" inquiry, the Court added that the specific facts in *Holland* "may well" provide a useful example of extraordinary circumstances.  *Id.* at 2564-65.  The petitioner there showed that his attorney failed to file a federal petition despite his many letters that emphasized the importance of doing so.  The petitioner went so far as to spell out the applicable legal rules to his attorney, but his attorney failed to communicate with him.  The Supreme Court found that, while the record suggested that Holland's case may well have presented "extraordinary" circumstances, the district court based its ruling not on a lack of such extraordinary circumstances, but on a lack of diligence.  *Id.* at 2565.  The Supreme Court disagreed with the district court's finding on diligence, noting that Holland pursued his rights by writing his attorney numerous letters seeking crucial information and providing direction, by repeatedly requesting that his attorney be removed from the case, and by filing his own *pro se* habeas petition on the very day he learned that the AEDPA clock expired due to his attorney's failings.  *Id.*

 Fifth Circuit cases decided before *Holland* give some guidance as to what justifies equitable tolling and what constitutes "reasonable" as opposed to "maximum feasible" diligence in the context of habeas cases**:**

> Although cautious not to apply the statute of limitations too harshly, we recognize that the equitable tolling doctrine is to be applied only if the relevant facts present sufficiently "rare and exceptional circumstances" that would warrant application of the doctrine.  We

recently explained that equitable tolling "applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights," and noted that "excusable neglect" does not support equitable tolling.

*Ott v. Johnson*, 192 F.3d 510, 513-14 (5th Cir. 1999) (internal citations omitted).

For example, the Fifth Circuit recognized that the two-forum rule potentially presented a "rare and exceptional circumstance" in *In re Hearn*, 376 F.3d 447, 457 (5th Cir. 2004) ("*Hearn I*"). In *Hearn I*, the statute of limitations expired while the petitioner was awaiting a decision on his motion for a certificate of appealability. The Fifth Circuit, in allowing the petitioner to present a tolling claim, stated that "[t]he two-forum rule appears to have effectively forced Hearn to choose between federal review of his pending writ petition and his right to pursue successive habeas relief under *Atkins*." *Id.* Upon motion for rehearing, the Fifth Circuit clarified its opinion and found that equitable tolling applied "because of the combination of the problem created by the Texas two-forum rule, . . . and the withdrawal of petitioner's counsel." *In re Hearn*, 389 F.3d 122, 123 (5th Cir. 2004) ("*Hearn II*").

In *In re Wilson*, 442 F.3d 872 (5th Cir. 2006), the statute of limitations likewise expired while the petitioner was awaiting a decision on his certificate of appealability. However, on the very last day of the limitations period, the petitioner filed successive applications for habeas relief in both state and federal court. The Fifth Circuit dismissed without prejudice the petitioner's application for failure to exhaust his *Atkins* claim in state court and the petitioner returned to state court to file his *Atkins* claim. After the Texas Court of Criminal Appeals denied the petitioner's state application, the petitioner filed his second successive application with the federal district court. However, because the petitioner did not first obtain authorization to file a successive application with the Fifth Circuit, the district court dismissed the application as unauthorized.

When the petitioner finally properly filed his new motion for authorization, the motion was time-barred. The Fifth Circuit found, however, that the petitioner had "demonstrated the sort of 'rare and exceptional circumstances' that justify equitable tolling of the limitations period." *Id.* at 878. Noting the similarity between the dilemma in the petitioner's case and that in *Hearn*, the Fifth Circuit stated that "[n]ot only did the two-forum rule prevent Wilson from filing his *Atkins* claim in state court, it also kept him from amending his federal application to include an *Atkins* claim because it would have been dismissed as unexhausted." *Id.* at 876.

The circumstances in the present case are like those in *Wilson* and *Hearn*. Henderson's initial federal habeas petition was pending when *Atkins* was decided. His *Atkins* claim could not be raised during federal review. The one-year limitations period for filing a new federal petition based on *Atkins* expired while Henderson's initial federal petition was still pending, and he could not raise the issue in state court due to the two-forum rule. In *Henderson I*, the court found that situation presented "rare and exceptional circumstances" warranting equitable tolling. The facts of this case likewise satisfy the "extraordinary circumstances" standard set forth in *Holland*. This court concludes that the two-forum rule presents extraordinary circumstances in this case.

The next issue for the court's consideration is whether Henderson pursued his rights diligently. The Fifth Circuit examined the issue of diligence in *Wilson*, 442 F.3d at 877. There petitioner had one day following the Texas Court of Criminal Appeals' decision denying his state application to file a petition in federal court. The filing deadline was November 12, 2004. He filed the petition in the district court on the deadline, but he filed the petition without first obtaining prior authorization to file a successive petition. On December 15, 2004, the district court dismissed the petition as successive. On December 22, 2004, a full forty days after his filing

deadline, petitioner filed a motion for authorization to file a successive petition. The Fifth Circuit

analyzed the issue of diligence as follows:

> Although Wilson arguably might have done more to preserve the availability of federal
> review while his successive state application was still pending, immediately following the
> state court's ruling Wilson did attempt to file in federal court and timely requested a
> deferred adjudication so that he could seek our authorization. As stated above, Wilson's
> district court filing would have been effective to toll the limitations period, if the district
> court had elected to transfer rather than dismiss it.
>
> The dissent asserts that in the single day left before limitations ran, Wilson could have filed
> a motion for authorization to file a successive habeas petition with this court, obtained a
> ruling on that motion, and then filed his petition in federal district court. It is possible that
> Wilson could have accomplished all this in one day but not likely. At least, we find it hard
> to fault Wilson's counsel for not undertaking that extraordinary effort.

*Id.* The Court found that petitioner presented "the sort of rare and extraordinary circumstances that

justify equitably tolling the limitations period." *Id.* at 878.

In another *Atkins* case the Fifth Circuit found that petitioner "exhibited a pattern of

diligently pursuing his rights in state and federal court." *Mathis v. Thaler,* 616 F.3d 461, 474 (5th

Cir. 2010). Mathis filed his first federal petition in April 2003. In June 2003, his court-appointed

federal counsel filed a second state application asserting *Atkins*, which was "futile because of the

Texas two-forum rule." *Id.* Five days after the *Soffar* decision was issued, he acted to preserve his

state *Atkins* claim by requesting a stay and abeyance from the district court. He also applied for a

motion for reconsideration in the state court of the denial of his second state application. Once the

State issued a new execution date, his focus shifted to staying the execution. As soon as the

motion to stay execution was denied, he filed a third state application including an *Atkins* claim in

April 2005, just days before his scheduled execution. When the third state application was denied

on the merits, petitioner filed a motion for authorization with the Fifth Circuit within one week of

the state court's order of denial. He also filed a successive federal petition within two weeks of the

granting of authorization to file a successive petition. The Fifth Circuit found that his "actions were more than reasonably diligent." *Id.* (citing *Holland*, 130 S. Ct. at 2562). However, the Court found that he was not entitled to equitable tolling because he had not shown extraordinary circumstances; because *Atkins* was decided nine months before he filed his first federal petition, he was not in the same procedural posture as the petitioners in *Wilson* and *Hearn*. *Id.* at 475-76.

In comparison, the Fifth Circuit found that a petitioner was not diligent in pursuing an *Atkins* claim in *In re Johnson*, 325 F. App'x 337 (5th Cir. 2009). Petitioner raised the claim for the first time seven years after the Supreme Court decided *Atkins*. The Court noted that he had "provided no reason for missing the deadline by years, much less a rare and exceptional one." *Id.* at 341. The Court thus held that he was not entitled to equitable tolling.

Outside of the context of *Atkins* cases, the Fifth Circuit has applied *Holland* a number of times. The Court held that a petitioner was diligent when he filed a federal petition 46 days after he first learned that his state application had been denied, although it had been denied fifteen months earlier. *Williams v. Thaler*, 400 F. App'x 886 (5th Cir. 2010). In another case, the Court noted that "delays of as little as four and six months precluded a finding of diligence." *Koumjian v. Thaler*, 484 F. App'x 966, 969 (5th Cir. 2012) (citations omitted). The delay of eight months in *Koumjian* was deemed to be not diligent. *Id.* More recently, the Court found that a petitioner was not diligent when he did not file any post-conviction proceedings until nine months after the limitations deadline and then waited four years to file a petition in federal court. *Arita v. Cain*, 500 F. App'x 352, 354 (5th Cir. 2012). The Court likewise found that a petitioner was not diligent since he did "nothing to further his legal claims" for nineteen months. *Manning v. Epps*, 688 F.3d 177, 185 (5th Cir. 2012).

The Director argued in his supplemental brief that Henderson showed a lack of diligence with respect to two periods of time. He initially argued that Henderson lacked diligence by waiting 57 days after the denial of certiorari to file a successive state habeas application. He further argued that Henderson lacked diligence by waiting forty days after the denial of his successive state writ to file a motion for authorization from the Fifth Circuit to file a successive petition. *See* Director's Supplemental Brief, page 10.

Henderson argued, in response, that he acted diligently with respect to both periods of time. Counsel asserted that he started to lay the legal and factual basis of his *Atkins* writ shortly after *Atkins* was decided. He sought out legal experts to help him understand the legal parameters of the *Atkins* opinion. He started accumulating documentation to support a claim that Henderson was mentally retarded. He took steps to have Henderson examined by Dr. Rosin before the Supreme Court denied certiorari. Dr. Rosin completed her report on March 19, 2004. Just five days later, on March 24, 2004, Henderson filed the successive state application raising the *Atkins* claim. He filed the successive state habeas application just 57 days after he was in a procedural posture to present an *Atkins* claim. With respect to the second period of time, counsel explained that it "was no small task" to incorporate the evidence that was developed in the state court hearing and carefully analyze the state court's decision in light of applicable federal law. He stressed that he could not simply "recycle" his state habeas pleadings; instead, he had to create new pleadings to meet the rigorous standards for successor habeas proceedings. He had to draft both a motion for authorization and a federal *Atkins* petition. Counsel stressed that he filed the motion seeking authorization to file a successive petition just forty days after he was in a procedural posture to do so.

The court finds Henderson's arguments to be persuasive. He actively and promptly pursued his *Atkins* claim. He did not "sleep on his rights." *See Koumjian*, 484 F. App'x at 969 (citations omitted). The delays of 57 and 40 days are closer in length to delays in cases where the Fifth Circuit found that petitioners exercised diligence, rather than the delays of four months and more that precluded a finding of diligence. *Id.*

What constitutes "reasonable diligence" is of crucial importance in this area of the law. In this case the question is a close one. Because, as discussed below, the answer does not change the result, this may not be an appropriate case to make a precedential ruling on equitable tolling. It is not uncommon for a court to assume that a party has met a burden on a close preliminary issue, when, either way, the ultimate decision will be the same.

Given the new reasonable diligence standard, the changes in the law counsel had to deal with during the time in question, the practical constraints on petitioner and counsel, the actions they took, and the stakes, it is difficult to say that forty, or even fifty-seven, days show a lack of diligence that would justify a refusal to consider the discrete issue of mental retardation. For all the reasons stated, the court finds that Henderson exercised reasonable diligence and that he is entitled to equitable tolling.

### III. MENTAL RETARDATION

**A. State Court Habeas Corpus Proceedings**

The second issue before the court concerns whether Henderson has shown that he is entitled to federal habeas relief from execution because he is mentally retarded. The State trial court conducted a full hearing on the issue of mental retardation on September 2, 2004 ("*Atkins* hearing"). When permission was granted to file the successive petition the Circuit Court did not

have the transcript of the proceedings before the Texas trial court. It has since been filed and this court has reviewed the complete record from the State courts as part of its analysis of this case.

Four witnesses testified for each side, including one mental health expert for Henderson and two for the State. Dr. Susana Rosin, who testified for Henderson, stated that she is a licensed psychologist. 2 RR 51.[1] She administered the Wechsler Adult Intelligence III (WAIS-III) to Henderson in January 2004 while he was on death row. *Id.* at 57-60. Henderson obtained a verbal score of 66, a performance score of 73, and a full-scale score of 66. *Id.* at 64. She also administered a Vineland Adaptive Behavior Scales, and several other psychological tests. *Id.* at 68-77. She reviewed numerous trial records as well as Henderson's juvenile and adult criminal history. It was her opinion that Henderson was mildly mentally retarded and that his 2004 I.Q. test of 66 is a valid and reliable one. *Id.* at 88. She acknowledged that a 1994 I.Q. test, done at the behest of Henderson's attorney before his capital murder trial, showed that he had a verbal I.Q. of 71, a performance score of 89, and a full-scale score of 77. *Id.* at 92-93. Judge Cochran noted in her concurring opinion that the 1994 test was administered by Dr. Hickman, a psychologist whose license had been revoked. *Ex parte Henderson*, 2006 WL 167836 at *2 n.3. Dr. Rosin testified that she did not believe that the lower score in 2004 reflected malingering on Henderson's part. 2 RR 59-60. Dr. Rosin expressed the following conclusion about the onset of Henderson's mental retardation:

> [T]here is no evidence of serious accidents, illnesses or head traumas past the age of eighteen which would account for a more recent drop in Mr. Henderson's IQ scores. Since IQ scores tend to remain fairly consistent throughout life, Mr. Henderson has, in all medical and statistical probability, functioned within the mild mentally retarded range since birth or

---

[1]RR refers to the transcript of the *Atkins* hearing, preceded by the volume and followed by the page number.

at least the time IQ scores can begin to be reliably measured (between the ages of four and six).

Petitioner's Response to Motion for summary Judgment, Exhibit 13, page 5; 2 RR 85-86. *See also Ex parte Henderson*, 2006 WL 167836 at *2 (Judge Cochran's concurring opinion quoting from the affidavit by Dr. Rosin). Dr. Rosin acknowledged that she had not seen any I.Q. test for Henderson before the age of eighteen and that nothing in the available records showed that he had an I.Q. under 70 before the age of eighteen. *Id.* at 97-98.

Henderson called three other witnesses who had known him as a child. Milton Glass, a minister with Hopewell Methodist Church, testified that he first met Henderson when he was in kindergarten and he taught Henderson in the fifth grade. *Id.* at 14-16. In fifth grade, Henderson was in both regular classes and a special education class. *Id.* at 16. Glass testified that Henderson was not "tidy," and did not have good hygiene. *Id.* at 17. He was well below his grade level for writing and a couple of years below his peers in verbal skills. *Id.* at 19. He did not turn in his homework, and sometimes "just didn't come" to school. *Id.* at 20. Glass testified that Henderson had low self-esteem and was gullible. *Id.* at 21. Henderson vandalized Glass's school room one time by spraying the room with a fire extinguisher. *Id.* at 21-22. Henderson's school records were unavailable because his school burned down in the early 1990's and all of the school records were destroyed. *Id.* at 22. Glass expressed the opinion that Henderson is mentally retarded, although he had not seen Henderson since he was in seventh or eighth grade. *Id.* at 23.

Altis Rutherford testified that she was in a Head Start kindergarten class with Henderson. *Id.* at 31. She testified that Henderson came to school smelling of urine and wearing clothes that were too big. *Id.* at 32. She described him as quiet, with low self-esteem, and gullible. *Id*. at 33. Rutherford did not think that Henderson had the ability to perform academically, and she stated

that Henderson was held back a year at some point. *Id.* at 36. She thought Henderson was "slow," but she did not think he was mentally retarded. *Id.* at 38.

Allegra Deloney testified that she had known Henderson all of her life. *Id.* at 42. She stated that he was gullible, had poor hygiene and often came to school smelling like urine. *Id.* at 42-45. She knew that Henderson's mother had four or five other children, and she did the best she could with them. *Id.* at 47.

The State offered several exhibits, which were attached to the *Atkins* hearing transcript. Henderson's prison records included his commissary request sheets, inmate request reports, and an extensive number of intricate, handwritten football "betting sheets" that had been found in Henderson's cell. Henderson kept a meticulous record of college and pro football games, the scores, his bets and whether he had won or lost. His handwritten request reports were clear, concise, and grammatically correct, with good spelling and a reasonably sophisticated vocabulary. He used such words as resolve, usually, grievances, warning, serious, manner, consequences, and avoid. Henderson's commissary requests were neat and spelled correctly; when he ordered several of the same items, he could multiply the per unit cost by the number requested and obtain the correct total cost. He sometimes ordered paperback and hardcover books and had Tom Clancy and Stephen King novels in his cell.

Henderson's juvenile intake and probation officer, Creea Impson, testified that during the time she supervised him, before he committed the capital murder, "he was not a follower. He was always aware of what he was doing and why he did it." 2 RR 119. He was able to formulate plans and carry them through. *Id.* He wrote rational letters of restitution to his crime victims. *Id.* at 120. Impson asserted that Henderson's problem was that he could not modify his behavior and did not

15

follow rules. *Id.* at 122-23. She expressed the opinion that Henderson was not mentally retarded. *Id.* at 141.

A Texas Ranger, Roger Lough, testified that he spent time interviewing Henderson after the capital murder. *Id.* at 145-46. Henderson responded coherently, rationally, and stayed on point. *Id.* at 146. Lough stated that he never had any reason to think that Henderson was mentally retarded. *Id.* at 147.

Steve Gilliland, a sociologist for the Texas prison system, testified that he did an intake assessment of Henderson when he arrived at death row in 1994. *Id.* at 158-64. The assessment included giving Henderson a short form of the WAIS-R. *Id.* at 164. When Henderson's I.Q. tested at 83, Gilliland decided that more extensive testing was unnecessary. *Id.*

The final witness was Dr. Michael Gillhausen, a licensed psychologist. *Id.* at 190-91. He was Gilliland's supervisor at the prison system. *Id.* at 195. He testified that Gilliland was a professional and that it was not his job to "watch every little move that he made." *Id.* Gillhausen testified that the reliability of the short form WAIS-R was 94%, which was "very acceptable." *Id.* at 194. He testified that the reliability of Henderson's I.Q. score "would allow us to state that his I.Q. would fall within the range from seventy-six to ninety, about ninety-five percent of the time, so that's fairly close." *Id.* at 196. He noted that Dr. Rosin had given Henderson some achievement tests for which Henderson scored at the seventh grade level when the mildly retarded usually cannot score above the sixth grade level. *Id.* at 203.

The discrepancies led Dr. Gillhausen to think that Henderson might have been motivated by "secondary gain" to do poorly on his 2004 post-*Atkins* testing. *Id.* at 200. He opined that when I.Q. tests vary widely, "the one that is most representative of their intelligence is the highest one"

because these are not "true-false" tests where you can "luck out." *Id.* at 201. "You can't fake knowing the answer . . . If you do know the answer, you could fake not knowing it." *Id.* at 202.

Dr. Gillhausen also stated that there are many reasons for putting someone in special education classes as a child, including because one's achievement level is low in relation to his I.Q., because he is mentally retarded or emotionally disturbed, or because of health concerns or disruptive behavior. *Id.* at 208. Dr. Gillhausen noted that Henderson had a long history of disruptive behavior. He stated that he had "trouble" with someone's mental retardation not being discovered until the age of 31. *Id.* at 211. Dr. Gillhausen was of the opinion that Henderson was not mentally retarded. *Id.* at 215.

The trial court issued findings of fact and conclusions of law following the hearing. The following findings were among the findings of fact:

19. Based on Dr. Rosin's affidavit and in-court testimony, the court finds that the testimony of Dr. Susana A. Rosin, is less credible than the in-court testimony of Dr. Michael Gillhausen and Mr. Steve Gilliland.

20. Dr. Rosin's assessment that Henderson has a full scale I.Q. score of 66 was based on a standardized I.Q. test that she administered after Henderson learned that establishing himself as mentally retarded could save his life.

21. Both Dr. Rosin and Dr. Gillhausen testified that Dr. Hickman evaluated Henderson on June 3, 1994, and his total I.Q. by Dr. Hickman's assessment was 77. *See* RR vol. 2 at 92-93, 201 and Exhibits S-1 at 2.

22. On June 9, 1994, Mr. Steve Gilliland under the instruction of Dr. Gillhausen administered the Rorschach procedure (short form I.Q. test) on Henderson upon his arrival at death row in Ellis Unit. The procedure was used as a screening process to determine if more tests were needed to determine prisoners' special learning needs or mental retardation. *See* RR vol. 2 at 159-160, 192-195.

23. Upon Mr. Gilliland's evaluation of Henderson, he received a total I.Q. score of 83 on the short form I.Q. test. *See* RR vol. 2 at 159-160, 192-196 and Exhibit S-3 at 2-3 and S-4 at 2-3.

24.     Moreover, the court finds Dr. Rosin's assessment of Henderson questionable in light of Dr. Gillhausen's clear testimony that Dr. Rosin's achievement assessment levels of Henderson converted to an I.Q. score are directly in line with Mr. Gilliland's I.Q. assessment of Henderson. *See* RR vol. 2 at 254.

25.     Accordingly, the court finds Dr. Gillhausen's and Mr. Gilliland's testimony more credible that Dr. Rosin's evaluations and conclusion.

26.     Dr. Rosin asserted that Henderson possesses deficient adaptive functions in self-direction, work skills, safety, and academic skills according to the Vineland scale. *See* Exhibit A attached to application and RR vol. 2 at 204.

27.     Ms. Creea Impson, who was Henderson's juvenile probation officer when he was around fifteen or sixteen, testified that she was able to communicate with Henderson in a rational way. Ms. Impson testified that "Henderson was totally able to take care of himself." Ms. Impson stated "he was always aware of what he was doing and why he did it." Ms. Impson testified that in her opinion Henderson was not mentally retarded. *See* RR vol. 2 at 115-116, 118-119, 141.

28.     Further, Ms. Impson testified that Henderson would write out long statements for her, and the statements were legible and understandable. Ms. Impson stated Henderson wrote letters of restitution to victims, and the letters were rational. She further stated that he was manipulative of the legal system while on probation. *See* RR vol. 2 at 120.

29.     Texas Ranger Roger Lough testified that Henderson responded rationally and on point to oral questions. Ranger Lough stated that during questioning Henderson stayed on tract and did not wander from subject to subject. *See* RR vol. 2 at 145-146.

30.     The court personally observed the demeanor of the Defendant during the questioning and cross-examination of Ranger Lough. The Defendant actively conferred with his attorney at 3:30 P.M. during the hearing and immediately prior to questioning of the witness; thereafter, as the Ranger testified, the Defendant watched him intently with his eyes moving from the lawyer to the witness with each question and answer.

31.     Ranger [L]ough testified that the Defendant, in his initial interview demonstrated a mental process that involved forethought and planning in the commission of the offense inconsistent with mental retardation.

32.     Dr. Gillhausen testified that Dr. Rosin's own assessment of Henderson showed that his academic skills are adequate. *See* RR vol. 2 at 204-205. Dr. Gillhausen stated Henderson's grievance dated May 15, 2002, which used words like resolve, warning, and consequence in proper context, demonstrated a kind of comprehension

beyond that [of] a mentally retarded person. *See* Exhibit S-5 at 4-6 and RR vol. 2 at 214-215.

33.     Dr. Rosin testified that she discussed books authored by Tom Clancy with Henderson. Dr. Rosin testified that Henderson read some books and looked at the Bible. *See* RR vol. 2 at 96.

34.     James Jones, Assistant Warden at Polunsky Unit, compiled an inventory of reading material in Henderson's cell. Books authored by Tom Clancy, Stephen King, and John Grisham are among the books inventoried. Also, Henderson possessed a believer's study Bible in his cell. *See* Exhibit S-2.

35.     In regards to the safety and self-direction deficits of behavior, Dr. Gillhausen testified that Henderson is not a safety risk to himself. Dr. Gillhausen testified that Henderson's disruptive behavior, which is not a diagnosis of mental retardation, was the reason for his poor work skills. *See* RR vol. 2 at 204-205.

36.     The court finds Dr. Gillhausen's testimony is more credible than Dr. Rosin's testimony because her assessments contradict each other, and Dr. Gillhausen's opinion was corroborated by Creea Impson.

37.     [Dr.] Rosin testified that she had not seen any I.Q. tests for Henderson before he turned eighteen years of age. Also, Dr. Rosin testified that to the best of her recollection nothing in the records showed that Henderson had an I.Q. below 70 prior to turning eighteen. *See* RR vol. 2 at 97-98.

38.     The court finds that Dr. Rosin's conclusion that the onset of Henderson's mental retardation was prior to age eighteen is not based on any documentation but is based solely on her own opinion, or on her training, experience, and education. *See* RR vol. 2 at 88.

39.     The court believes Dr. Gillhausen's testimony that there was no evidence nor had he seen any evidence or documentation that Henderson scored 70 or below on a standardized I.Q. test before the age of eighteen. *See* RR vol. 2 at 197, 202-203.

CR 621-24.[2]

The trial court issued the following conclusions of law:

40.     Because Henderson has failed to demonstrate by a preponderance of the evidence that he is mentally retarded as defined by the American Association on Mental

---

[2]CR refers to the clerk's record from Henderson's mental retardation successive writ, followed by the page number.

Retardation (AAMR) and section 591.003(13) of the Texas Health and Safety Code, his ground for relief must be denied. *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004).

41.     Henderson has failed to prove that he has significantly subaverage general intellectual functioning defined as a total I.Q. of 70 or below.

42.     Moreover, Henderson has failed to prove that he has significant limitations in at least two adaptive skills functioning categories.

43.     Finally, Henderson cannot establish the onset of mental retardation occurred before the age of eighteen.

44.     The Trial Court has had the benefit of extended observation of demeanor of the Defendant during extensive pre-trial hearings, jury selection, attorney-client consultations, the trial and habeas corpus proceedings. Although the Trial Court cannot articulate with expertise a definition and identification of mental retardation, the Court concludes that it can identify it when it sees it; the court has not observed mental retardation in the Defendant.

45.     Based on the greater weight of evidence in this proceeding, the court finds that Henderson is not mentally retarded so as to excuse him from execution.

CR 624-25. The trial court went on to specifically find that Henderson failed to establish that he is mentally retarded.

The Texas Court of Criminal Appeals subsequently adopted all of the trial court's findings in denying relief except for Number 21, which was characterized as not being supported by the record. *Ex parte Henderson*, 2006 WL 167836 at *1. Judge Cochran noted in her concurring opinion that Number 21 referred to a 1994 I.Q. test, done at the behest of Henderson's trial attorney before his capital murder trial, that was administered by a psychologist whose license had been revoked. *Id.* at *2 n.3. Judge Cochran opined that there was evidence that could have supported a finding going either way with respect to the issue of mental retardation, but the court was obligated to be "especially deferential" to the trial judge's factual findings. *Id.* at *4.

**B. Standard of Review**

Under AEDPA, a petitioner who is in custody pursuant to the judgment of a State court is not entitled to federal habeas corpus relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).[3]  "[A] determination of a factual issue made by a State Court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

The Supreme Court explained that the provisions of AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693, 122 S. Ct. 1843, 1849 (2002).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S.—, —, 131 S. Ct. 770, 786 (2011).

---

[3]The Director argued that relief should be denied on the merits of the mental retardation claim based on the standards set forth in 28 U.S.C. § 2254(d).  *See* Director's answer, page 9.  He did not argue that the case should be dismissed pursuant to 28 U.S.C. § 2244(b), so that possible argument is deemed waived.

### C. Discussion and Analysis

In *Atkins*, the Supreme Court held that the Eighth Amendment protects against the execution of mentally retarded individuals. 536 U.S. at 321, 122 S. Ct. at 2252. The Court noted that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317, 122 S. Ct. at 2250. The Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* (citation omitted). Nonetheless, the Court cited with approval the American Association on Mental Retardation ("AAMR") definition of mental retardation. *Id.* at 309 n.3, 122 S. Ct. 2245 n.3.

Following *Atkins*, the Texas Court of Criminal Appeals adopted a test for mental retardation that mirrors the AAMR definition, and thus requires an applicant claiming mental retardation to demonstrate: (1) significantly subaverage general intellectual functioning, usually defined as an I.Q. of about 70 or below; (2) accompanied by related limitations in adaptive functioning; and (3) onset prior to the age of eighteen. *Ex parte Briseno*, 135 S.W.3d at 7. "To state a successful claim, an applicant must satisfy all three prongs of this test." *In re Salazar*, 443 F.3d 430, 432 (5th Cir. 2006) (citing *Hall v. State*, 160 S.W.3d 24, 36 (Tex. Crim. App. 2004) (*en banc*)).

The State court's legal analysis in this case was based on *Briseno*. After applying *Briseno* to the facts of this case, the State court found that Henderson had not satisfied any of the three factors and held that he had not shown that he was mentally retarded. Henderson's petition for a writ of habeas corpus does not focus on the State court's application of clearly established federal law. Indeed, any attempt to challenge the decision based on § 2254(d)(1) would have been futile in light of the Fifth Circuit's determination that "it is impossible to conclude that the state court's . . .

22

reliance on the factors outlined in *Briseno*, resulted in a decision that was based on an unreasonable application of *Atkins's* holding." *Chester v. Thaler*, 666 F.3d 340, 346 (5th Cir. 2011). "[T]he application of the *Briseno* factors . . . cannot be an 'unreasonable application' of *Atkins* broad holding." *Id.* at 347.

Instead, Henderson's challenge to the State court decision focused on the court's findings of fact concerning the elements of mental retardation, and he argued that he has rebutted the presumption of correctness by clear and convincing evidence. In his response to the Director's motion for summary judgment (Doc. #25), he employed two lines of attack in challenging the State court findings. First, he cited portions of the record in arguing that the State court's determination of the facts was unreasonable. He also attached new evidence that was never presented to the State court. The Director argued that the new evidence was unexhausted and procedurally defaulted. *See* Doc. #32 at 3-5.

Since the submission of the pleadings by the parties, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S.—, —, 131 S. Ct. 1388, 1398 (2011). "[E]vidence later introduced in federal court is irrelevant." *Id.* at 1400. "The same rule necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2), as all nine Justices acknowledged." *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011). Most recently, the Fifth Circuit explicitly rejected past holdings "that where new affidavits supplement rather than fundamentally alter a state court claim, they may be admissible for review of a habeas claim under § 2254(d)." *Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012). Evidence not submitted to the State court is no longer an exhaustion issue since it cannot be considered. *Jimenez v. Thaler*, 2013 WL 1632803 at *1 (5th Cir. April 17, 2013). As such, Henderson's submission of evidence in this

proceeding that was not previously submitted to the State court cannot be considered in conjunction with § 2254(d)(2).

With respect to the evidence presented during the *Atkins* hearing, Henderson challenged the results of the short form I.Q. test administered by Gilliland. He complained that Gilliland administered the test without direct supervision, that he did not record the individual subtest scores and that the underlying documentation no longer exists to be evaluated and verified. However, Gilliland testified that he administered the short form WAIS test as instructed by Dr. Gillhausen. 2 RR 159. The test was administered to rule out the possibility of mental retardation. *Id.* Based upon Henderson's total score of 83, he concluded that additional tests were unnecessary. When Henderson objected to the reliability and admissibility of the test results during the *Atkins* hearing for the same reasons presented here, the trial court overruled the objection after ascertaining that Gilliland was reading from a report that he had prepared. 2 RR 161. The trial court also appropriately noted that the "objections go to the weight as opposed to admissibility." *Id.* The State court subsequently found Gilliland to be credible and accepted his testimony. The State court's factual determinations, including its credibility findings, are entitled to a presumption of correctness. *Richards v. Quarterman*, 566 F.3d 553, 563 (5th Cir. 2009). To the extent that the State court's determination of the facts was based on Gilliland's testimony, Henderson has not rebutted the presumption of correctness of the State court's finding by clear and convincing evidence.

Henderson also challenged Dr. Gillhausen's testimony concerning the reliability and validity of the short form I.Q. score. The issue of the reliability of the short form WAIS-R was discussed during the State court hearing. Dr. Gillhausen testified that the reliability of the test was 94%, which was "very, very high and acceptable for any psychological test." 2 RR 194. He added

that "[t]he reliability of that test would allow us to state that his IQ would fall within the range from seventy-six to ninety, about ninety-five percent of the time." 2 RR 196. Henderson argued that even though the documentation submitted by Dr. Gillhausen supported a reliability measure of 94%, that reliability coefficient would not enable him to conclude that Henderson's I.Q. fell within a range of seventy-six to ninety, about ninety-five percent of the time. To the extent that Henderson supported his argument with affidavits that were not presented to the State court, such affidavits are irrelevant. Based on the evidence actually presented during the *Atkins* hearing, the State court found that Dr. Gillhausen was credible and accepted his testimony. Henderson has not rebutted the presumption of correctness of the State court's findings by clear and convincing evidence.

It should be further noted that the Fifth Circuit has considered challenges to prison I.Q. scores and concluded that it was not "objectively unreasonable for the state court to assign some weight" to the score. *Lewis v. Thaler*, 701 F.3d at 796. Henderson's prison I.Q. score was one of the factors employed by the State court in determining that he was not mentally retarded. Henderson has not shown that the consideration of the prison I.Q. score was objectively unreasonable.

Henderson also focused on the preferability of considering a full scale WAIS-III test, as opposed to a short form I.Q. test. The preferability of the full scale test, however, is not an issue. Instead, the trial court found that Dr. Rosin was less credible than Dr. Gillhausen and Steve Gilliland. The trial court further found that Henderson's I.Q. score of 66 was based on a standardized test that Dr. Rosin administered after Henderson learned that establishing himself as mentally retarded could save his life. In response, Henderson asserted that the argument that he was malingering was pure speculation. Nonetheless, Dr. Gillhausen noted the possibility of

"secondary gain" in his testimony. 2 RR 200. The Director persuasively argued that Henderson had motive to malinger. A state habeas court may discount scores due to the incentive of malingering. *Taylor v. Quarterman*, 498 F.3d 306, 308 (5th Cir. 2007). In the present case, the State court never actually made a finding of malingering; nonetheless, it was not objectively unreasonable for the court to consider the fact that Henderson's post-*Atkins* I.Q. score of 66 was based on a standardized test that Dr. Rosin administered after he learned that establishing himself as mentally retarded could save his life.

With respect to the second *Briseno* factor of adaptive functioning, Henderson argued that the evidence admitted during the *Atkins* hearing overwhelmingly demonstrated that he had limited adaptive functioning in at least two areas. He cited the testimony of Reverend Milton Glass, Althis Rutherford and Allegra Deloney. He further cited Dr. Rosin's testimony that it was her professional opinion that he had at least two adaptive deficits based on her administration of accepted instruments.

The Director, on the other hand, noted Dr. Gillhausen's testimony that Henderson had a very good vocabulary as well as an ability to form concepts and comprehend procedures and rules. 2 RR 214-15. Prison records showed that Henderson possessed copies of Tom Clancy and Stephen King novels. Ms. Impson, Henderson's juvenile intake probation and parole officer, testified that he was not a follower, was always aware of what he was doing and why he did it and wrote rational letters of restitution to his crime victims. 2 RR 115-120. Dr. Gillhausen also testified that a child's placement in special education classes does not always demonstrate mental retardation. He stated that some students are placed in special education because they are emotionally disturbed, have health concerns or, as was most likely the case with Henderson, have a history of disruptive behavior. 2 RR 208.

In light of the evidence, Judge Cochran appropriately observed in her concurring opinion that the evidence in this case could have resulted in a finding going either way. *Ex parte Henderson*, 2006 WL 167836 at *4. She added, however, that the trial court's findings were entitled to deference. *Id.* The court is in agreement with her assessment. Henderson has not rebutted the presumption of correctness of the State court findings by clear and convincing evidence.

The last *Briseno* factor concerns whether the disability of mental retardation originates before age 18. Henderson focused on the following statement by Dr. Rosin:

> [T]here is no evidence of serious accidents, illnesses or head traumas past the age of eighteen which would account for a more recent drop in Mr. Henderson's IQ scores. Since IQ scores tend to remain fairly consistent throughout life, Mr. Henderson has, in all medical and statistical probability, functioned within the mild mentally retarded range since birth or at least the time IQ scores can begin to be reliably measured (between the ages of four and six).

Petitioner's Response to Motion for Summary Judgment, Exhibit 13, page 5; 2 RR 85-86. *Also see Ex parte Henderson*, 2006 WL 167836 at *2 (Judge Cochran's concurring opinion quoting from the affidavit by Dr. Rosin). Dr. Rosin's assertion, however, cuts both ways. There was no evidence that Henderson's I.Q. dropped due to a serious accident, illness or head trauma; thus, his I.Q., whatever it may be, presumptively has remained fairly stable throughout his life. The State court simply found that Dr. Rosin's conclusion as to the onset of mental retardation was not based on any documentation since there was no documentation. There was no evidence or documentation that Henderson scored 70 or below on a standardized I.Q. test before the age of eighteen. Henderson has not shown clear and convincing evidence of the onset of mental retardation before the age of eighteen. He has not rebutted the presumption of correctness of the State court's findings by clear and convincing evidence regarding this issue.

27

Overall, Henderson failed to show that the State court's findings with respect to any of the *Briseno* factors were objectively unreasonable. At best, Henderson has only shown that fairminded jurists could disagree about the correctness of the State court's decision; thus, the decision was not unreasonable.

## D. Alleged Infirmities in the *Atkins* Hearing

Just prior to the *Atkins* hearing, Henderson filed a motion for a continuance and discovery. The motion was discussed at the beginning of the hearing. 2 RR 5-11. Henderson noted problems authenticating records from the State licensing board for psychologists, but the records were admitted and the issue became moot. He also wanted a continuance in order to depose Mildred Nelson, his third grade teacher, regarding adaptive behavior deficits. He stated that he needed to depose her since she was outside of subpoena range and would not appear voluntarily. He likewise wanted to depose Deborah Delong Walker, his Head Start teacher, who lived outside of Texas, was outside of subpoena range, and would not appear voluntarily. He also wanted a continuance in order to give him the opportunity to receive an MRI. He finally wanted a continuance to depose Dr. Black regarding a consult concerning the 1994 I.Q. test administered by Dr. Hickman since Dr. Black would not cooperate. 2 RR 11, 94.

To the extent that Henderson has a complaint about the adequacy of the *Atkins* hearing, it is initially noted that it "is axiomatic that infirmities in state habeas proceedings do not constitute grounds for federal habeas relief." *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (internal quotation marks and citation omitted). The Fifth Circuit, however, has recognized an exception in *Atkins* cases where a state court failed to provide a forum for a petitioner to develop his claim after making a *prima facie* showing of mental retardation. *See Hines v. Thaler*, 456 F. App'x 357, 361 (5th Cir. 2011) (discussing a case out of Mississippi and another case out of Texas). In the present

case, the State of Texas conducted an evidentiary hearing and permitted Henderson to develop his claim; thus, the exception noted in *Hines* does not apply.

Even if Henderson could challenge the adequacy of the State habeas hearing, he has not shown that he is entitled to relief. In the context of denying a continuance at trial, as opposed to a habeas proceeding, the Fifth Circuit has stated that "[t]o warrant federal habeas relief, the denial of the continuance must have been not only an abuse of discretion but also 'so arbitrary and fundamentally unfair' that it denied [petitioner] due process." *McFadden v. Cabana*, 851 F.2d 784, 788 (5th Cir. 1988). Among the factors the court should consider are:

> "[T]he diligence of the defense in interviewing witnesses and procuring their presence, the probability of procuring their testimony within a reasonable time, the specificity with which the defense is able to describe their expected knowledge or testimony, the degree to which such testimony is expected to be favorable to the accused, and the unique or cumulative nature of the testimony."

*Schrader v. Whitley*, 904 F.2d 282, 288 (5th Cir. 1990). If a petitioner shows abuse of discretion, then he must also show prejudice. *Id.*

Henderson failed to satisfy this standard in any respect. He failed to show that the denial of a continuance was an abuse of discretion. Moreover, apart from the request for an MRI, it appears that the evidence would have been cumulative. He also failed to show prejudice from the denial of an MRI or the denial of the cumulative evidence. Henderson simply failed to show that the denial of his motion for a continuance and for further discovery was so arbitrary and fundamentally unfair that it denied him due process.

### E. Mental Retardation as a Jury Question

Henderson also complained that he was not given a jury to decide the issue of mental retardation. The Fifth Circuit, however, did not grant him permission to bring this issue in a

successive petition.  Furthermore, the Director persuasively argued that Henderson's response to his answer was an impermissible amendment to his petition and that it was time-barred.  The issue is not properly before the court, and Henderson is not entitled to relief on this claim.

## IV.  CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a federal habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A).  Although Henderson has not yet filed a notice of appeal, the court may address whether he would be entitled to a certificate of appealability.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court.  Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000).  In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a

valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

Based on the facts and cases cited in this memorandum, and the majority opinion, this court believes the decision rendered today is correct. But, there was a thoughtful dissent to the majority opinion, which discussed, among other things, the difference between actual innocence of the crime and "innocence of the death penalty," and the possible application of a new statutory definition. Accordingly the undersigned is not going to say that no jurist of reason could find this decision debatable. A COA will be granted on the question of whether Henderson has satisfied his burden under § 2254(d) of showing that he is not eligible for the death penalty.

## V. CONCLUSION

The court finds that Henderson is entitled to equitable tolling. However, given the consideration of the issue by the State courts, and the limited review allowed to this court, he has not shown that he is entitled to federal habeas corpus relief with respect to the issue of mental retardation.

It is **ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED** with prejudice. A certificate of appealability is **GRANTED** with respect to the issue of whether whether Henderson has satisfied his burden under § 2254(d) of showing that he is not eligible for the death penalty. All motions not previously ruled on are **DENIED**.

So **ORDERED** and **SIGNED** this 6  day of **September, 2013.**

_____

Ron Clark, United States District Judge